1

2

3        UNITED STATES DISTRICT COURT

4        NORTHERN DISTRICT OF CALIFORNIA

5

6

7   UNITED STATES OF AMERICA,

8           Plaintiff,                         No. CR 13-00282 PJH

9       v.                                     **ORDER DENYING MOTION TO DISMISS**
                                               **AND MOTION TO SUPPRESS**
10  ANTONIO GOMEZ,

11          Defendant.

12  _____/

13        On March 5, 2014, this matter came before the court on the motions of defendant

14  Antonio Gomez to dismiss the indictment and to suppress evidence.  Having carefully

15  considered the relevant legal authority, the arguments of counsel, the motion papers and

16  the record, the court DENIES Gomez's motions for the reasons set forth below.

17  **I.    Motion to Dismiss**

18        **A.    Procedural History**

19        On March 12, 2009, Hayward Police Department officers arrested Gomez following

20  a raid on a residence in Hayward, where they recovered firearms, ammunition,

21  methamphetamine, and other evidence.  Declaration of Ethan A. Balogh in Support of

22  Motions Filed January 28, 2014 ("Balogh Decl."), Ex. A.  State authorities charged Gomez

23  with offenses related to the contraband recovered on March 12, 2009, but those charges

24  were dismissed in April 2009 for insufficient cause.  Balogh Decl. ¶ 5.  Gomez represents

25  that in the summer of 2009, Hayward Police Inspector R. Coffey told Gomez that the United

26  States planned to indict him for the contraband recovered on March 12, 2009.  Balogh

27  Decl. ¶ 9.

28

United States District Court
For the Northern District of California

1    Following the March 2009 arrest, Gomez was also charged in Alameda Co. Superior

2    Court with drug and firearm offenses dating from 2007, for which Gomez had outstanding

3    arrest warrants that led, in part, to the March 2009 raid.  On May 29, 2009, Gomez pled no

4    contest to the 2007 charges, and received a sentence of 8 years and 8 months, to be

5    served at half time.  Gomez served about three and a half years in Alameda County Jail,

6    then was transferred to state prison for the balance of his sentence.  About two weeks

7    before his scheduled parole date, the government filed the indictment in this case.

8    On May 2, 2013, the government indicted Gomez for possessing methamphetamine

9    with intent to distribute, in violation of 21 U.S.C. § 841(a)(1); possessing a firearm in

10   furtherance of a drug trafficking crime, in violation of 21 U.S.C. § 924(c); and being a felon

11   in possession of a firearm, in violation of 21 U.S.C. § 922(g)(1).  These charges are based

12   on allegations concerning Gomez's possession of narcotics and firearms in March 2009.

13   Counsel for Gomez represents that on December 11, 2013, he visited the Hayward

14   property where Gomez was arrested in March 2009.  The house and other structures have

15   been razed, and the property only consists of bare land with no structures or

16   improvements.  Balogh Decl. ¶ 7 and Ex. C.

17   Gomez moves for dismissal for preindictment delay pursuant to the due process

18   clause of the Fifth Amendment and Federal Rule of Criminal Procedure 48.

19       **B.    Legal Standard**

20           **1.    Due Process**

21   Delay between commission of the crime and indictment is generally limited by the

22   statute of limitations, but in some circumstances the Due Process Clause requires

23   dismissal of an indictment brought within the limitations period.  United States v. Huntley,

24   976 F.2d 1287, 1290 (9th Cir. 1992) (citing United States v. Marion, 404 U.S. 307 (1971)).

25   The Ninth Circuit applies a two-part test to determine whether preindictment delay denied

26   due process: (1) the defendant must prove actual, non-speculative prejudice from the

27   delay; and (2) the length of the delay, when balanced against the reason for the delay,

28   must offend those "fundamental conceptions of justice which lie at the base of our civil and

political institutions." <u>Huntley</u>, 976 F.2d at 1290 (citations and internal quotation marks omitted).  While the length of the delay and the reason for the delay are factors to be balanced by the court, a finding of actual prejudice is a prerequisite to finding a due process violation.  <u>United States v. Horowitz</u>, 756 F.2d 1400, 1405 (9th Cir. 1985).

### 2. Rule 48

Rule 48 provides that the court "may dismiss an indictment, information, or complaint if unnecessary delay occurs in: (1) presenting a charge to a grand jury; (2) filing an information against a defendant; or (3) bringing a defendant to trial."  Fed. R. Crim. P. 48(b).  "A Rule 48(b) dismissal should be imposed only in extreme circumstances, upon prosecutorial misconduct and demonstrable prejudice or substantial threat thereof."  <u>United States v. Hutchison</u>, 22 F.3d 846, 850 (9th Cir. 1993) (citing <u>United States v. Sears, Roebuck & Co.</u>, 877 F.2d 734, 737-38 (9th Cir. 1989)) (internal quotation marks omitted), <u>abrogated on other grounds by United States v. Wells</u>, 519 U.S. 482 (1997).

### C. Due Process Challenge to Delay

Each of the three counts against Gomez has a five-year statute of limitations. Although the government indicted Gomez within the five-year limitations period, Gomez contends that his right to due process was violated by the delay of four years and two months in returning an indictment based on conduct at the time of his arrest in March 2009.

### 1. Actual Prejudice

#### a. Ability to Defend Without Lost Evidence

Where the claim is that evidence has been lost due to the delay, the defendant must demonstrate by definite proof that the loss is prejudicial to him.  This means that a defendant must at least show that the loss of the witness or documentation 'has actually impaired his ability meaningfully to defend himself.'"  <u>United States v. Cederquist</u>, 641 F.2d 1347, 1351 (9th Cir. 1981) (citing <u>United States v. Pallan</u>, 571 F.2d 497, 501 (9th Cir. 1978)).

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1      To establish actual prejudice due to preindictment delay, Gomez argues that the

2  crime scene has been destroyed, and that Gomez has no way to reconstruct the events of

3  the March 12, 2009 raid without access to the crime scene in its condition as of March

4  2009.  In particular, Gomez argues that he cannot recreate each officer's line of sight

5  behind the cyclone fence surrounding the property, so as to meaningfully cross-examine

6  each officer on his account of what he saw.  Defense counsel initially argued that none of

7  the photos taken on the day of the raid even showed the fence, but conceded at the

8  hearing that the photos did, in fact, show the fence, but not each officer's line of sight.  The

9  court's review of the photo CD confirms that the surrounding fence is visible in many photos

10 taken on the day of the raid.  Balogh Decl., Ex. D.

11     This record does not support a showing of prejudice on two grounds.  First, the

12 timing of the destruction of the house does not establish prejudice.  The indictment was

13 filed May 2, 2013, when the structures were presumably still standing on the property.

14 During oral argument, defense counsel proffered that the property was demolished

15 sometime between his appointment in October 2013, when he saw the property still intact,

16 and December 11, 2013, when he returned to the property and saw it had been razed.

17 Gomez has not shown that the destruction of the house was related to the government's

18 delay in bringing the indictment.  See United States v. Mills, 641 F.2d 785, 789 (9th Cir.

19 1981) (the evidence "could have become unavailable for defendants' purposes even if the

20 government had indicted defendants one month after the murder. Consequently, it cannot

21 be said that the unavailability of this evidence was related to a pre-indictment delay.")

22 (citing United States v. Walker, 601 F.2d 1051, 1057 (9th Cir. 1979)).  The government

23 does not have a duty to preserve the crime scene in its original state, which could have

24 been altered merely by pruning the trees and bushes on the property, or disposing of the

25 garbage and debris scattered throughout the yard, as visible in the photographs.  In this

26 case, photographic evidence of the crime scene, taken by law enforcement, is available to

27 support Gomez's defense.

28

United States District Court

For the Northern District of California

1    Second, Gomez has not shown that the preindictment delay resulted in loss of

2  evidence that would actually impair Gomez's ability to defend himself.  Gomez contends

3  that none of the photos from the crime scene "shows any sight lines, the fences at issue, or

4  anything remotely capturing the crime scene."  Reply at 6.  On the contrary, the photos

5  clearly show the cyclone fence surrounding the property, and would support Gomez's

6  argument that the officers on the other side of the fence would have had obstructed view of

7  the yard while Gomez and other suspects were running from police.  The availability of

8  photos taken on the day of the raid to support the defense distinguishes this case from U.S.

9  v. Sanders, CR 12-42 CW (July 22, 2013), notice of appeal filed Aug. 19, 2013, motion for

10  leave to file for reconsideration filed Oct. 15, 2013, where there is no mention of the

11  availability of photographs of the missing evidence, and the court found that the loss of a

12  tinted car window, which was removed after the defendant's arrest, stemmed in part from

13  the government's delay and established prejudice resulting in a violation of the right to

14  speedy trial.

15    Furthermore, Gomez does not contend that any witnesses have become unavailable

16  due to the delay.  Gomez can interview other witnesses who were present at the raid, and

17  can call witnesses who were living in the house or detached garage to recreate the setting,

18  including obstructed views.  See Cederquist, 641 F.2d at 1352 (finding no actual prejudice

19  because the missing documents that became unavailable due to preindictment delay were

20  not the only means by which the defense could have been presented, and there was other

21  evidence to be "substitutes for the documents").

22    The loss of evidence here does not impair Gomez's ability meaningfully to defend

23  himself, and does not amount to a due process violation.

24                    **b.    Sentencing Prejudice**

25    Gomez also contends that the preindictment delay resulted in sentencing prejudice

26  because he has lost the ability to serve any sentence imposed in this case concurrently

27  with his 2009 state court sentence.  Gomez conceded at oral argument that he is not

28  entitled to a concurrent sentence, but he argues that the delay in indicting him has deprived

United States District Court

For the Northern District of California

1  him of the ability to ask the court to run any part of his federal sentence, should he be

2  convicted, concurrently with his state court sentence, particularly because he is subject to

3  mandatory minimum sentences under counts one (possession with intent to distribute

4  meth) and two (possession of firearm in furtherance of drug trafficking).

5  　　　　Despite the non-speculative effect of the delay on sentencing, the prejudicial effect

6  of delay on Gomez's sentence is "too speculative to implicate his right to due process."

7  United States v. Martinez, 77 F.3d 332, 336 (9th Cir. 1996).  Gomez's argument presumes

8  that the court would grant a request for a concurrent sentence, and overlooks the court's

9  discretion in sentencing on count 3 (felon in possession).  Id.  Furthermore, Gomez

10  concedes that the court could "credit Mr. Gomez for the four years he has already served,"

11  which would avoid any unfair prejudice.  Mot. at 9.  Under Martinez, Gomez fails to show

12  actual sentencing prejudice caused by the preindictment delay.

13  　　　　　　　**2.**　　　　**Reason for Delay Balanced Against Length of Delay**

14  　　　　Not only has Gomez failed to establish the prerequisite of actual prejudice caused by

15  the delay to establish a due process violation warranting dismissal of the indictment, but the

16  government's 4-year delay does not offend "fundamental conceptions of justice," under the

17  second prong of the Huntley/Marion test, to warrant dismissal.

18  　　　　Under the second prong, the court balances the length of the delay against the

19  reasons for it to determine whether a pre-indictment delay has violated due process.  Intent

20  or reckless behavior by the government is not an essential ingredient; if mere negligent

21  conduct by the prosecutors is asserted, then obviously the delay and/or prejudice suffered

22  by the defendant will have to be greater than that in cases where recklessness or

23  intentional governmental conduct is alleged.  United States v. Moran, 759 F.2d 777, 782

24  (9th Cir. 1985).  After making the balancing determination, a pre-indictment delay will be

25  permissible unless it violates fundamental conceptions of justice which lie at the base of our

26  civil and political institutions.  Id. (citing United States v. Lovasco, 431 U.S. 783, 790

27  (1977)).

28

United States District Court

For the Northern District of California

In the absence of actual prejudice, it is unnecessary to probe into the government's reasons for delay to make a balancing determination in this case. Gomez represents that Hayward Police Inspector Coffey told him in 2009 that the United States planned to indict him, though defense counsel conceded at the hearing that Inspector Coffey could not determine when the federal government would prosecute Gomez. Even accepting as true Gomez's assertions that Inspector Coffey told him that the federal government would bring charges and that the government deliberately withheld filing the indictment until Gomez's state sentence was almost complete, to deprive Gomez of the benefit of a concurrent sentence, the Ninth Circuit has recognized that the decision when to prosecute is a matter within the government's discretion: "The federal decision not to prosecute during the state proceedings was a policy decision, more properly seen as the explanation of the delay, than as prejudice caused by the delay." Huntley, 976 F.3d at 1291. As the Ninth Circuit recognized in Moran:

> In Lovasco, the Supreme Court held that prosecuting a defendant following investigative delay does not constitute a deprivation of due process, even if the defendant's "defense might have been somewhat prejudiced by the lapse of time." 431 U.S. at 796. The Court was reluctant to allow courts to substitute their judgment for the prosecutor's in the decision of when an indictment should issue. The Court noted that prosecutors are not under any duty to file charges as soon as probable cause exists, nor even as soon as the Government "has assembled sufficient evidence to prove guilt beyond a reasonable doubt." Id. at 792. This is especially so in cases where a criminal transaction involved more than one person or more than one illegal act, as in this case. Id. at 793.

Moran, 759 F.2d at 783. See also United States v. Armstrong, 517 U.S. 456, 464 (1996) ("In the ordinary case, 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.'") (quoting Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978)).

On the record before the court, the timing of the lab results counters the inference raised by Gomez that the filing of the indictment was timed solely to maximize his state imprisonment. During oral argument, the government represented, without objection, that

1 the indictment was filed about two months after forensics results became available in

2 March 2013, with an analysis of the suspected methamphetamine that was seized during

3 the raid.  But even if the indictment was delayed for the purpose of waiting for the

4 defendant to serve a state court sentence, as Gomez contends, such purpose for delay in

5 commencing prosecution, in itself, does not amount to an "intentional device to gain tactical

6 advantage over the accused," Marion, 404 U.S. at 324, or "reckless disregard of

7 circumstances, known to the prosecution, suggesting that there existed an appreciable risk

8 that delay would impair the ability to mount an effective defense."  Lovasco, 431 U.S. at

9 795 n. 17.  Gomez cites no authority that the government's delay in filing an indictment, to

10 wait for a defendant to serve a sentence validly imposed by a state court, offends

11 "fundamental conceptions of justice."  Huntley, 976 F.2d at 1290.  See United States v.

12 Oaks, 527 F.2d 937, 941 (9th Cir. 1975) ("No interest legitimately protected by the First and

13 Fifth Amendments is involved.").  His arguments about the impact of the government's

14 delay in waiting for him to serving 4 years of a state sentence do not demonstrate a due

15 process violation that warrants dismissal of the indictment.

16                    **3.    Improper Use of Rule 17(c) Subpoena**

17        At the outset of the court's criminal calendar, the court was notified that a custodian

18 of records for the Santa Rita Jail, Alameda County Sheriff's Office, had appeared with

19 documents pursuant to a subpoena issued by defense counsel, which required the

20 custodian to appear at the motion hearing set in this matter.  The court received the

21 documents and excused the custodian prior to hearing argument on the motions.  When

22 the matter was called, the court questioned defense counsel about his issuance of the

23 subpoena.  Defense counsel responded that he served the subpoena on the custodian of

24 records for the Santa Rita Jail pursuant to Federal Rule of Criminal Procedure 17(c), which

25 provides that "[a] subpoena may order the witness to produce any books, papers,

26 documents, data or other objects the subpoena designates," and Criminal Local Rule 17-1,

27 which requires "a party seeking to compel the appearance of a witness to testify and bring

28 documents to a criminal proceedings pursuant to Rule 17(c)" to utilize the court's subpoena

United States District Court

For the Northern District of California

1  form CAND 89A, which does not require an order of the court.  The government objected to

2  the subpoena as unauthorized use of a Rule 17 subpoena as a means of obtaining

3  discovery in violation of Rule 16.

4       It appears to the court that the primary goal of the subpoena was to obtain the

5  documents described therein rather than the custodian's testimony about those documents.

6  And because the documents were presumably sought in aid of the motion to dismiss, they

7  should probably have been sought in advance of the hearing so that they could be

8  incorporated into or referenced by the briefs.  Instead of proceeding pursuant to Criminal

9  Local Rule 17-2, which would have resulted in the production of the documents in advance

10  of the hearing, defense counsel utilized the form subpoena permitted by Criminal Local

11  Rule 17-1 which contemplates the appearance of a witness to testify at a criminal

12  proceeding.  But the court did not authorize an evidentiary hearing or give approval for

13  calling witnesses at the motion hearing that was set in this matter.  Under Civil Local Rule

14  7-6, which is applicable to criminal actions and proceedings by operation of Criminal Local

15  Rule 2-1, "No oral testimony will be received in connection with any motion, unless

16  otherwise ordered by the assigned Judge."  Defense counsel's use of the subpoena form

17  pursuant to Criminal Local Rule 17-1 was therefore improper in this case, where no witness

18  was scheduled to testify.  And it was also a wasted effort as the documents the witness

19  was requested to bring, were produced at the hearing – too late to be reviewed by all

20  parties and the court for use in resolving the motion being heard.

21       Where a party seeks the production of books, papers, documents or other objects in

22  advance of trial or other evidentiary proceeding, to allow time to review the items that are to

23  be offered in evidence, Criminal Local Rule 17-2 requires an order of the court pursuant to

24  Rule 17(c).  Here, the court set a hearing on the motions to hear oral argument, and did not

25  order an evidentiary proceeding or production of documents in advance of the proceeding.

26  Gomez's request to allow the custodian of records to testify was and is therefore denied.

27       Furthermore, the court determines that an evidentiary hearing is not necessary to

28  resolve the issues raised in the motion to dismiss.  The court has reviewed the subpoena

United States District Court
For the Northern District of California

1  and the documents that were lodged by the custodian of records.  To the extent that

2  Gomez relies on the improperly subpoenaed documents to show that Hayward Police

3  Inspector Coffey visited him in jail in 2009 and told him that the United States planned to

4  indict him, the court has assumed that fact as true for purposes of the motion to dismiss,

5  obviating the need to introduce the documents into evidence.  The disposition of the

6  documents will be discussed at the next status conference.

7       **D.    Rule 48**

8       Gomez argues, in the alternative, that even if the court does not find a constitutional

9  violation, the indictment should be dismissed for unnecessary delay pursuant to Rule 48.  A

10  district court may dismiss even when the prosecutorial delay does not amount to a violation

11  of the Sixth Amendment.  See United States v. Hattrup, 763 F.2d 376, 377 (9th Cir. 1985).

12  The Ninth Circuit has emphasized that, "although the rule confers discretion upon the

13  district judge, a Rule 48(b) dismissal should be imposed only in extreme circumstances."

14  United States v. Yuan Qing Jiang, 214 F.3d 1099, 1101 (9th Cir. 2000) (where the

15  defendants failed to demonstrate actual prejudice sufficient to justify dismissal with

16  prejudice, the lesser sanction of dismissal without prejudice was appropriate) (citations and

17  internal quotation marks omitted).

18       Because of the severity of the sanction of dismissal, the Ninth Circuit has held that a

19  district court abuses its discretion if it imposes the sanction of dismissal under Rule 48(b)

20  without first satisfying the requirements of "caution" and "forewarning."  Id. (quoting Sears,

21  877 F.2d at 737-38).  "The term 'caution' is used 'in a non-obvious, technical sense' and

22  'requires findings of prosecutorial misconduct and actual prejudice to the accused.'"  Id.

23  (quoting Huntley, 976 F.2d at 1292).

24       **1.    Forewarning**

25       Gomez contends that there was no opportunity for the court to give the government

26  forewarning that delay would subject it to the sanction of dismissal, because this case was

27  not pending before the court before indictment, such as by way of criminal complaint, to

28  give the court an opportunity to warn the government of the consequences of delay.  In

**United States District Court**
For the Northern District of California

1    support of his contention that the forewarning requirement is therefore not required, Gomez

2    cites a decision from the District of Arizona, where the district court "never obtained

3    supervisory control of this matter through the filing of a complaint prior to indictment," and

4    held that the government would be attributed with "constructive knowledge of the Court's

5    statutory authority pursuant to Rule 48(b) and that this is warning enough" to satisfy the

6    forewarning requirement to dismiss an indictment that "languished unattended" in the

7    prosecutor's office, resulting in 4-year and 7-month preindictment delay.  United States v.

8    Henry, 815 F. Supp. 325, 327 (D. Ariz. 1993).  This holding is neither binding nor

9    persuasive.  The Ninth Circuit has declined to adopt the Henry rationale in the absence of

10   prosecutorial neglect.  See United States v. Talbot, 51 F.3d 183, 187 n.2 (9th Cir. 1995)

11   (reversing Rule 48(b) dismissal where the court found "no indication of forewarning in the

12   record before us" and declining to charge the government with constructive knowledge of

13   forewarning).

14           The government argues that the "forewarning" requirement could be satisfied, in

15   cases where the court has no supervisory control prior to the filing of the indictment, by the

16   court's promulgation of a local rule that is applied uniformly.  This argument is supported by

17   Seventh Circuit authority, and is more persuasive than the "constructive knowledge"

18   reasoning of Henry, which would eviscerate the forewarning requirement:

19                   We have no doubt that a district court has the power to promulgate a
                rule which would lead to the dismissal of indictments returned after
20              such a period of unnecessary or unexplained delay.  However, such
                a rule should be applied uniformly within the district and enforced
21              only after the United States Attorney is aware that such a
                consequence will automatically follow a delay of that magnitude.
22              Absent such forewarning, or some other showing justifying an
                exercise of discretion in this particular case, we hold that it was error
23              to dismiss the indictment simply because unnecessary delay of
                approximately eight months occurred before the indictment was
24              returned.

25   United States v. Clay, 481 F.2d 133, 138 (7th Cir. 1973) (reversing Rule 48(b) dismissal of

26   indictment "simply because unnecessary delay of approximately eight months occurred

27   before the indictment was returned").  The Ninth Circuit has adopted the forewarning

28   requirement recognized in Clay, but has not recognized that promulgation of a court rule

United States District Court

For the Northern District of California

1  would satisfy that requirement.  See Sears, 877 F.2d at 738 ("A Rule 48(b) dismissal with

2  prejudice is proper only after a 'forewarning of the consequences' of further delay.").  This

3  court has not promulgated such a rule, and Gomez fails to cite precedential authority that

4  would have put the government on notice that a consequence as severe as dismissal

5  would result from unnecessary or unexplained delay.  Gomez has not shown that any

6  forewarning of dismissal was given to justify such an extreme sanction, as required under

7  Ninth Circuit authority.  Yuan Qing Jiang, 214 F.3d at 1101.

8              **2.    Caution**

9        The Ninth Circuit has held, "In addition to a forewarning, this court requires that a

10  district court exercise 'caution' in dismissing a case under Rule 48(b).  The caution

11  requirement is satisfied where the reason for dismissal is 'prosecutorial misconduct and

12  demonstrable prejudice or substantial [threat] thereof.'"  Sears, 877 F.2d at 738.

13        Notwithstanding Gomez's arguments that the government engaged in purposeful,

14  bad faith delay by waiting for him to serve his state sentence before filing the indictment

15  here, the government's delay does not rise to the level of misconduct.  See Moran, 759

16  F.2d at 783 (noting that prosecutors are not under any duty to file charges as soon as

17  probable cause exists, nor even as soon as the government "has assembled sufficient

18  evidence to prove guilt beyond a reasonable doubt").  Furthermore, Gomez has not shown

19  prejudice from the delay because he has not been deprived of the ability to defend himself,

20  as discussed above.  Rule 48(b) dismissal is therefore not warranted here.

21  **II.    Motion to Suppress Warrantless Search**

22        **A.    Factual Background**

23        The following summary of facts is taken primarily from Officer Deplitch's police report

24  ("Police Rpt."), submitted as Exhibit A to the Balogh Declaration.

25              **1.    Surveillance**

26        During the first week of March 2009, the Hayward Police Department Street Narcotic

27  Team ("SNT") and Special Duty Unit ("SDU") conducted surveillance on the property

28  located on S____ Road in Hayward ("the property"), on at least two occasions.  On at least

two occasions, Officer Deplitch saw multiple people come and go from the residence, including Pam Malone, whom Officer Deplitch recognized from previous arrests and contacts, and Renee Yarbrough.  Officers observed Malone arriving and leaving the property in various vehicles, and saw the subjects walking along the north side of the house, near the attached garage, when they came and went.  Officer Deplitch viewed an aerial photo of the property and discovered a detached garage, or outbuilding, located behind the main residence ("the outbuilding" or "the detached garage").  Photos taken on the day of the raid show that there was a gate to a walkway along the north side of the house, which led to the outbuilding at the rear of the property.  Balogh Decl., Ex. D.  A six-foot high cyclone fence with wooden slats ran around the entire property.

During one surveillance operation, the door to the attached garage (at the front of the house) was open and it appeared empty and no indication that anyone lived in the attached garage.  Officer Deplitch believed that Malone was staying in the detached garage behind the residence.  Officer Deplitch checked Malone's criminal record and learned that she was a convicted felon, on felony probation with a 4-way search clause.  Officer Deplitch also received credible information during prior investigations that Malone was an associate of Gomez.

On March 6, 2009, members of SNT/SDU were conducting surveillance on the property to locate Gomez.  At 1900 hours, a car arrived and parked on the street in front of the residence.  Two men exited the car and walked towards the north side of the house.  One of male subjects appeared to be Gomez but officers could not positively identify him because of the dim lighting.

On March 12, 2009, Officer Deplitch conducted surveillance and saw multiple subjects come and go from the north side of the property, including Pam Malone and Renee Yarbrough, but not Gomez.

### 2.   March 12, 2009 Raid

On March 12, 2009, officers of the Hayward Police Department ("HPD") began surveillance and then conducted a warrantless raid at the property, including searches of

United States District Court
For the Northern District of California

1   the primary residence ("the house"), the curtilage (or "the grounds"), and the detached

2   garage at the rear of the property.

3       The officers reported two goals in conducting the March 12, 2009 raid: (1) if Gomez

4   was located at the property, to arrest Gomez, who was subject to two active arrest

5   warrants; and (2) upon securing his arrest, to search "the location" per probation search

6   conditions for Pam Malone (a.k.a. Pam Souza, Pam Sosa).  Police Rpt. at 9.

7       At about 11:30 am on the day of the raid, Officer Deplitch was entering the gate to

8   the property next-door, when he heard the metal cyclone fence gate at the property under

9   surveillance being opened.  Officer Deplitch saw someone exit through the gate and

10  Deplitch ducked down to avoid being seen, but heard a male voice say, "Oh shit the police!"

11  Deplitch recognized Gomez's voice, having talked to him several times.  Gomez ran back

12  through the gate along the north side of the house, toward the back of the property.

13      Sgt. Torres and Officer Runolfson were observing the property from an unmarked

14  vehicle parked on S_____ Road, south of the house.  They saw two subjects exit the

15  property on the north side of the house and walk toward the sidewalk, then look down

16  S_____, and, seeing police units, turn back toward the rear of the property.  Sgt. Torres

17  and Officer Runolfson later identified the subjects as Gomez and Medellin.

18      Officers surrounded the property.  Officer Butler, who was assigned to the south side

19  of the property, from behind a fence, saw Gomez, Medellin and Moran run from the

20  detached garage.  Butler saw Gomez run to the rear sliding door of the main house (to the

21  west of the detached garage), and saw Medellin and Moran run east from the detached

22  garage towards the back of the property.  Butler saw Gomez pounding on the rear sliding

23  door to get inside the house, and Gomez made eye contact with Officer Butler.  An

24  unknown subject let Gomez inside the house through the sliding door.

25      SDU personnel drove through the cyclone fence on the south side of the property,

26  and an officer announced two subjects (Medellin and Moran) were running eastbound away

27  from the house.  Medellin and Moran jumped over a fence into the next door neighbor's

28  yard, where they were captured and placed under arrest.

14

United States District Court
For the Northern District of California

SDU officers surrounded the property, and several officers surrounded the main house.  A female opened the door, and the officers, not knowing where Gomez had fled, requested the occupants to exit the house so they could conduct a protective sweep, for the safety of the officers and the occupants.  Gomez was seen trying to blend in with the other occupants as they exited the house, but was recognized by Officer Hoyer who detained Gomez in handcuffs.  After Officer Deplitch confirmed Gomez's warrants, he placed Gomez under arrest.  At the time of his arrest, Gomez had currency, primarily in $20 bills, a small glass vial, and a cell phone.

### 3.    Protective Sweep

During the protective sweep of the main residence, no occupants were found inside. Officers moved to the detached garage, where the roll-up door was open.  No occupants were inside the detached garage.  Sgt. Matthews saw an UZI assault rifle and sawed off shotgun in the detached garage in plain view.

### 4.    Interviews and Owner's Consent to Search House

The owner of the property was present, and Officer Deplitch told her that Gomez was wanted for outstanding warrants.  The owner said Gomez had come into her house and said the police were outside.  The owner said that Pam (Malone) lived in the detached garage, and moved in about 3 weeks ago but had not yet paid rent.  The owner said there were multiple parties at Pam's since she moved in, and the owner was concerned about the high pedestrian traffic in and out of Pam's garage.  Because there was no bathroom in the detached garage, Pam and her visitors used the bathrooms in the main house.  The owner first noticed Gomez the day before, around 1700 hours when Pam was having a party.  The morning of the raid, the owner saw Gomez in the house standing behind her and asked him what he was doing inside her house.  Gomez appeared nervous and looked out the window toward the street.  The owner told Gomez to get out of her house.  She went to the rear sliding doors and saw two people running away, then saw the police crash through the fence.

United States District Court

For the Northern District of California

Sgt. Torres asked for consent to search the main house, which the owner provided. Officer Runolfson, who was designated as the finder, located six Remington 12-gauge shotgun shells wrapped in a white sock, which was in a kitchen cabinet.  In a bedroom closet, between the bedroom and bathroom, he found a bullet proof vest hanging in plain view.

The owner did not know how the sock filled with shotgun shells got into her kitchen. She did not know who the bullet proof vest belonged to, and stated that her grandchildren slept in the room where the vest was found, but that Pam and her visitors used the bathroom [presumably near or next to the bedroom].  The owner identified Pam Malone in a photo as the person who rented her garage, and identified Gomez as the person who was in the backyard with Malone the day before and then in her house the morning of the raid.

Another witness, the property owner's grandson who lived in the house, stated that Gomez had been staying with Pam Malone in the garage.

Another witness, a friend of the owner's family, had been staying with the owner for about two weeks, and said Gomez had been staying in the garage with Pam Malone for the past two weeks.  This witness said there was a birthday party for Gomez the night before on the patio area of the detached garage; the witness had a few drinks at the party then went inside the main house.  The witnesses were not aware of any guns, drugs, or gang activity.

**5.      Search of Detached Garage**

Officers then searched the detached garage, where surveillance cameras were positioned outside to view the north walkway.  In plain view, on the floor at the foot of one of the beds, Officer Deplitch found a 9mm UZI assault rifle with a 25-round magazine in the handle, and a high capacity 32-round magazine lying next to it.  At the head of the bed, they found a 12-gauge sawed off shotgun.  Officer Deplitch removed a round from the chamber and four rounds from the magazine.  The officers also located an empty box of Remington 12-gauge ammunition in the kitchen area of the garage, and next to the box was a motel receipt signed "Pamela Sosa."  The officers located a box containing 18

16

United States District Court

For the Northern District of California

1  rounds of Winchester 5.56 mm, 55 grain, full metal jacket ammunition in the kitchen on a

2  shelf.  Among other things, officers also found two digital scales with crystalline residue

3  which appeared to be methamphetamine, a black camera case containing five shotgun

4  shells and a 9mm handgun magazine loaded with one round of ammunition, a black canvas

5  bag containing small ziplock bags, one of which contained a small amount of suspected

6  methamphetamine, and a black patent leather purse, containing indicia belonging to Pam

7  Malone, with ziplock bags containing crystalline residue which appeared to be

8  methamphetamine.

9           **6.       Search of Curtilage/Property Grounds**

10         Officers searched the pathway along the north side of the main house, where Officer

11  Deplitch first heard Gomez and where Officer Butler first saw Gomez, and searched the

12  area between the house and the detached garage.  On top of some plants near the stairs

13  leading to the back of the house, they found two clear plastic bags, one containing

14  marijuana and the other containing methamphetamine.  The bags appeared to be in new

15  condition, with no dust or dirt on them.  They located a Glock 9mm handgun on the north

16  side of the house, wedged between two large plastic garbage bags on the ground, about

17  five feet from the gate where Gomez and Medellin exited the property.

18      **B.     Document Filed Under Seal**

19         Eight days after briefing was submitted on the motion to suppress, the government

20  submitted an ex parte document, for filing under seal, in support of its opposition to the

21  motion to suppress.  The court granted the motion to file the document under seal, having

22  determined that the government made a sufficient showing about concerns for witness

23  safety to support the request for filing the document under seal.  At the motion hearing,

24  Gomez objected to the filing under seal as prejudicial, giving no opportunity to respond, and

25  requested that the document be made available for attorneys' eyes only.  The government

26  objected to the request for limited disclosure on the grounds of witness safety, citing

27  Magistrate Judge Ryu's ruling denying Gomez's motion to unseal documents related to the

28  discovery disputes.  Doc. no. 60.

In <u>McCray v. Illinois</u>, 386 U.S. 300, 313-14 (1967), the Supreme Court recognized that the informant's privilege, in the context of suppression hearings, may preclude the defendant from cross-examining the informant and, for that matter, from cross-examining officers regarding the informant's identity.  Disclosure of an informant's identity is within the trial court's discretion and is not required simply because the informant's information relates to probable cause.  <u>United States v. Alexander</u>, 761 F.2d 1294, 1303 (9th Cir. 1985); <u>United States v. Anderson</u>, 509 F.2d 724, 728-30 (9th Cir. 1974).  Under Ninth Circuit authority, it is well-settled "that 'a trial court need not require federal agents to disclose the identity of a reliable informant where the sole ground for seeking that information is to establish the existence of probable cause for arrest.'"  <u>United States v. Fixen</u>, 780 F.2d 1434, 1439 (9th Cir. 1986) (quoting <u>United States v. Mehciz</u>, 437 F.2d 145, 149 (9th Cir. 1971)).  See also <u>McCray</u>, 386 U.S. at 311 ("Much less has the Court ever approached the formulation of a federal evidentiary rule of compulsory disclosure where the issue is the preliminary one of probable cause, and guilt or innocence is not at stake"); <u>United States v. Marshall</u>, 526 F.2d 1349, 1359 (9th Cir. 1975) (no right to disclosure of informant "who provided only information which, combined with other facts, gave the officers probable cause to arrest").

Following <u>McCray</u>, the Ninth Circuit in <u>Anderson</u> held that disclosure of an informant's identity to the accused or his attorney is not constitutionally required when probable cause is at issue, but is a discretionary matter for the trial court, to balance the defendant's need for the information with the government's interest in protecting its sources.  <u>Anderson</u>, 509 F.2d at 728-29 (citing <u>McCray</u>, 386 U.S. at 312 and n.11; <u>Roviaro v. United States</u>, 353 U.S. 53, 58-62 (1957)).  The <u>Anderson</u> court articulated a procedure for conducting in camera proceedings as the court deems necessary in exercising its discretion:

> In striking that balance the trial judge, in the exercise of his discretion, can conduct an in camera hearing to which the defense counsel, but not the defendant, is admitted. The defense counsel could then be permitted to participate in the in camera proceedings and to cross-examine the in camera

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> witness or witnesses.  When defense counsel has been admitted to the in camera hearing for this limited purpose, the district court can and should, when appropriate, place defense counsel under enforceable orders against unwarranted disclosure of the evidence that he has heard.  Cf. Alderman v. United States, 394 U.S. 165, 185, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).  If the trial judge is satisfied that an in camera hearing in which neither the defendant nor his attorney participates is adequate to explore the foundations of the informant's information, then no disclosure is necessary.

Anderson, 509 F.2d at 729-30.

In the discovery disputes referred to Magistrate Judge Ryu, the parties litigated the issues related to disclosure of the identity of a confidential informant and other witnesses, including witness safety.  Magistrate Judge Ryu carefully considered factual information contained in ex parte sealed declarations to determine that early disclosure of certain witness information was not warranted due to the existence of significant witness safety concerns.  Magistrate Judge Ryu noted that "[o]ne declaration explores the role of a confidential informant in Defendant's arrest."  Doc. no. 60 at 7.  In denying Gomez's motion to unseal the ex parte submissions, Magistrate Judge Ryu emphasized that witness discovery will not be withheld altogether, and ordered that delayed witness material be produced approximately two weeks before trial, subject to a protective order.  Id.

Magistrate Judge Ryu also denied Gomez's request for disclosure of the confidential source regarding Pam Malone's use of the S_____ Road residence, recognizing Gomez's argument that the government must demonstrate that the police had probable cause to believe that she resided there to conduct a probation search.  Magistrate Judge Ryu balanced the competing concerns under Roviaro and held that disclosure of the informant's identity was not warranted:

> In Roviaro, the Supreme Court held that the government may exercise its privilege not to disclose the identity of a confidential informer.  353 U.S. at 59.  However, the trial court may require disclosure "[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused."  Id. at 60-61.  In order to balance the "public interest in protecting the flow of information against the individual's right to prepare his defense," id. at 62, the Ninth Circuit has instructed courts to examine "(1) the degree of the informant's involvement in the criminal activity; (2) the relationship between the defendant's

19

United States District Court

For the Northern District of California

asserted defense and the likely testimony of the informant; and (3) the government's interest in nondisclosure." <u>United States v. Gonzalo Beltran</u>, 915 F.2d 487, 489 (9th Cir. 1990) (citation omitted).

The court has examined the government's Rule 16(d) submission in connection with the confidential informant, and concludes that disclosure of the informant's identity could lead to testimony or other evidence that would be "of material benefit to the defense." <u>See id</u>. at 489. However, the government has presented evidence that disclosure of the informant's identity could place the informant in danger. Given these safety concerns, any order to disclose the informant's identity would be pursuant to the same timing and protective order as other witnesses for whom the government has safety concerns. To the extent the government argues that the informant should never be identified, it will need to present additional facts to support that position. As there is no trial set in this case, the court continues this issue at this time.

Doc. no. 60 at 12. No objections to Magistrate Judge Ryu's discovery rulings were filed, and, as noted in her discovery order, the ex parte affidavits are preserved for appellate review.

In opposition to the instant motion to suppress, the government provided the court with a copy of a sealed ex parte affidavit previously filed before Magistrate Judge Ryu, as well as an ex parte filing in support of the government's opposition to the suppression motion. The court adopts Magistrate Judge Ryu's findings about concerns for witness safety and her conclusion that, at this juncture, these concerns outweigh defendant's need for the information related to any confidential witness's role in Gomez's arrest and the probation search of Pam Malone's residence. The information contained in the sealed affidavits set forth sufficient facts to support the reliability of the information given by the informant, including the basis for how the informant came to know the information. <u>See United States v. Rowland</u>, 464 F.3d. 899, 907-08 (9th Cir. 2006). The court determines that the ex parte filings and the publicly filed exhibits related to the suppression motion contain sufficient information to decide the issues presented on the motion, and that no further evidentiary hearing is necessary. Gomez's objection to the sealed filing of the ex parte affidavit in support of the government's opposition to the motion to suppress is therefore overruled.

**United States District Court**
For the Northern District of California

**C.    Legal Standard**

The United States Constitution protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. Amend. IV.  Warrantless searches and seizures by law enforcement are presumptively unreasonable.  See Kyllo v. United States, 533 U.S. 27, 31 (2001).  "Any exception to the Fourth Amendment warrant requirement must be proven by a preponderance of evidence, and this burden is upon the government."  United States v. Linn, 880 F.2d 209, 214 (9th Cir. 1989), abrogated on other grounds by Florida v. White, 526 U.S. 559 (1999).

**D.    Discussion**

**1.    Standing**

As a threshold matter, the government challenges Gomez's standing to bring a motion to suppress.  A defendant has standing to challenge the legality of a search on Fourth Amendment grounds only if he has a "legitimate expectation of privacy" in the place searched.  Rakas v. Illinois, 439 U.S. 128, 148 (1978).  The defendant bears the burden of establishing his legitimate expectation of privacy.  Rawlings v. Kentucky, 448 U.S. 98, 104 (1980).  "Legal 'possession of a seized good [is not] a substitute for a factual finding that the owner of the good had a legitimate expectation of privacy in the area searched.'"  United States v. Zermeno, 66 F.3d 1058, 1061 (9th Cir. 1995) (quoting United States v. Salvucci, 448 U.S. 83, 92 (1980)).

Based on the evidence in the record, Gomez has demonstrated his standing to assert a reasonable expectation of privacy as an overnight guest of Pam Malone in the detached garage.  See Minnesota v. Carter, 525 U.S. 83, 90 (1998) ("an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not").  Gomez has not, however, shown that he had any reasonable expectation of privacy in the house, or main residence.  There is no evidence that he was staying overnight in the main house, and his standing to bring a motion to suppress is limited to challenged evidence seized from the detached garage.

**United States District Court**

For the Northern District of California

1   Even if Gomez had standing to bring a motion to suppress with respect to the entire

2   property, including the house, his motion fails on the grounds that the police conducted a

3   valid protective sweep and found evidence of criminal activity in plain view, conducted a

4   valid probation search of Pam Malone's residence in the detached garage, and obtained

5   the property owner's consent to search her home.

6                              **2.      Protective Sweep and Plain View**

7   Gomez contends that the officers' purported protective sweep was not justified, and

8   that the unlawful protective sweep taints the other bases for conducting a search.  The

9   government argues that entry into the house and the detached garage were necessary to

10  protect the officers and to assess the safety of others.

11                              **a.      Protective Sweep**

12   Officers who have effected an arrest at a residence may conduct a limited search

13  for persons who may destroy evidence or pose a threat to the officers' safety, if the officers

14  can point to articulable facts that support their belief that others may be on the premises.

15  United States v. Hoyos, 892 F.2d 1387, 1396 (9th Cir. 1989) (citations omitted), overruled

16  on other grounds by United States v. Ruiz, 257 F.3d 1030 (9th Cir. 2001).   In Hoyos, the

17  court found that the following facts articulated by the officers justified their entry into the

18  searched residence to look for Hoyos' associates as Hoyos was being arrested at the back

19  door of the residence: during their surveillance of the searched residence, the officers

20  observed four people leave the residence; the initial entry through the front door was not

21  made until the entering officers heard another officer shout from the backyard that suspects

22  were running back inside; prior to the entry, the officers reasonably believed that at least six

23  men were involved in the distribution of cocaine; they knew that a co-conspirator had been

24  arrested and that a large amount of cocaine had been seized, leaving at least five men

25  including Hoyos who were not in custody; they had observed Hoyos's car in the driveway;

26  and the officers believed that several persons who had left the residence were aware that

27  the house was under law enforcement surveillance.

28

22

1    The court in <u>Hoyos</u> held that the fact that no one else was found in the house, or that

2  no weapons were located, is not dispositive.  "Our review is limited to facts known to the

3  officers prior to the protective sweep.  We must be careful not to use hindsight in limiting

4  the ability of police officers to protect themselves as they carry out missions which routinely

5  incorporate danger."  <u>Hoyos</u>, 892 F.2d at 1397 (citation and internal quotation marks

6  omitted).

7    Here, the officers provided "specific and articulable facts supporting their belief that

8  other dangerous persons may be in the building or elsewhere on the premises."  <u>United</u>

9  <u>States v. Delgadillo-Velasquez</u>, 856 F.2d 1292, 1298 (9th Cir. 1988).

10  • Gomez was wanted on two outstanding felony arrest warrants which involved

11   methamphetamine and weapons, specifically, an assault weapon.  Police Rpt.

12   at 9.

13  • Gomez is a self admitted DGF street gang member.  <u>Id</u>.

14  • Officer Deplitch was familiar with Gomez's criminal history which includes

15   arrests for firearms, drugs and violent crimes.  Police Rpt. at 9; Deplitch Decl.

16   ¶ 3.

17  • Even after officers observed Moran and Medellin running away from the

18   residence, an unknown subject let Gomez into the house.  Police Rpt. at 11.

19  • At the time that the female opened the door for the officers, they did not know

20   where Gomez had fled.  Police Rpt. at 11.

21  • Due to a fresh pursuit, after Gomez ran into the back of the house, the

22   officers requested that the occupants exit the house.  At that point, Gomez

23   had not been placed under arrest and his whereabouts were still unknown.

24   Police Rpt. at 11.  Gomez was arrested when he tried to exit the house while

25   the occupants were evacuated.

26  • The officers asked the occupants to exit so that the officers could conduct a

27   protective sweep for the safety of the officers and the occupants.  Police Rpt.

28   at 11.

1    As in Hoyos, these facts, and the officers' earlier observations during surveillance that

2    multiple subjects came and went to the property, support the officers' belief that others may

3    have been in the house.  In particular, the officers observed an unknown subject let Gomez

4    into the house while he was under pursuit, so the facts known to the officers support their

5    belief that other dangerous persons may have been in the house.

6        Gomez contends however that it was unreasonable for the officers to conduct a

7    protective sweep of the detached garage after taking Gomez into custody and deploying a

8    flash-bang grenade in the detached garage, to which no one responded.  The fact that the

9    officers used a flash-bang device is not determinative of whether they believed that others

10   may have been in the detached garage.  The fact that during surveillance, officers had

11   observed multiple subjects come and go through the gate leading to the detached garage,

12   and the fact that officers had just seen two other suspects, who were taken in custody after

13   fleeing from the property, support the officers' belief that other dangerous persons might

14   have remained in the detached garage.  Furthermore, the sealed, ex parte affidavit

15   submitted by the government in opposition to the motion to suppress provides strong

16   factual support to justify the protective sweep.  The specific facts articulated by the officers,

17   to support their belief that other dangerous persons may have been on the premises,

18   establish the presence of exigent circumstances to justify the protective sweep here.

19                                **b.    Plain View**

20       Because the protective sweep was justified, the firearms found in the detached

21   garage in plain view were properly seized.  "'[T]he police may seize any evidence that is in

22   plain view during the course of their legitimate emergency activities.'"  United States v.

23   Stafford, 416 F.3d 1068, 1076 (9th Cir. 2005) (quoting Mincey v. Arizona, 437 U.S. 385,

24   392 (1978)).  "'To fall within the plain view exception, two requirements must be met: the

25   officers must be lawfully searching the area where the evidence is found and the

26   incriminatory nature of the evidence must be immediately apparent.'"  Id. (quoting Roe v.

27   Sherry, 91 F.3d 1270, 1272 (9th Cir. 1996)).  "The second requirement of the plain view

28   exception, that the incriminating nature of the evidence be 'immediately apparent,' focuses

1   on whether the officers had 'probable cause to believe they were associated with criminal

2   activity.'" Id. (citation omitted).

3        To satisfy the requirements for the plain view exception to a warrantless search, the

4   government has shown (1) the officers were lawfully searching the house and the detached

5   garage during a protective sweep, and (2) the incriminating nature of the evidence was

6   apparent because both firearms (UZI assault rifle and sawed off shotgun) were dangerous

7   weapons, giving rise to probable cause to believe the weapons were associated with

8   criminal activity.  See Stafford, 416 F.3d at 1076 (holding that the officers had probable

9   cause to believe that assault rifles and ammunition found in plain view were illegal).  Thus,

10  these firearms were properly seized.

### 3.    Probation Search of Malone

12       The government contends that Pam Malone's probation search condition authorized

13  suspicionless searches to validate the subsequent search of her residence in the detached

14  garage.  The record demonstrates that (a) there was reasonable suspicion to believe that a

15  crime was being committed by Pam Malone based on either (i) the officers' observation of

16  the weapons in plain view supported reasonable, or (ii) the information contained in the

17  sealed ex parte affidavit; and (b) the officers had probable cause to believe that Pam

18  Malone, who was subject to a probation search condition, lived in the detached garage.

### a.    Reasonable Suspicion for Probation Search

20       Pam Malone was sentenced to five years probation by the Alameda County Superior

21  Court, subject to the standard condition that she must "submit to search and seizure by any

22  Probation Officer or any other law enforcement officer at any time of the day or night with or

23  without a search warrant, including: vehicle, residence, person or any other property under

24  your control."  Opp., Ex. B (Malone probation terms).

25       A probation search condition permits law enforcement to perform a search with less

26  than probable cause or reasonable suspicion "only if the police had advance knowledge

27  that the search condition applied before they conducted the search."  United States v.

28

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  *Caseres*, 533 F.3d 1064, 1075–76 (9th Cir. 2008) (citation omitted).  It is undisputed that

2  Officer Deplitch was aware of Malone's probation search condition.  Police Rpt. at 8.

3         Gomez argues that Pam Malone's probation conditions, which forego a warrant

4  requirement, did not forfeit the constitutional requirement of probable cause, or at least

5  reasonable suspicion.  Reply at 13 (citing United States v. Knights, 534 U.S. 112, 121

6  (2001) ("When an officer has reasonable suspicion that a probationer subject to a search

7  condition is engaged in criminal activity, there is enough likelihood that criminal conduct is

8  occurring that an intrusion on the probationer's significantly diminished privacy interests is

9  reasonable.").  The government relies on United States v. King, 736 F.3d 805, 806 (9th Cir.

10  2013), to argue that Pam Malone's probation search condition does not even require

11  reasonable suspicion.  In King, the court of appeals held that "a suspicionless search,

12  conducted pursuant to a suspicionless-search condition of a violent felon's probation

13  agreement, does not violate the Fourth Amendment."  There, the defendant's probation

14  agreement included the following term: "Defendant is subject to a warrantless search

15  condition, as to defendant's person, property, premises and vehicle, any time of the day or

16  night, **with or without probable cause**, by any peace, parole or probation officer."  King,

17  736 F.3d at 806 (emphasis added).

18         Here, there is no evidence that Pam Malone's search condition includes similar

19  suspicionless-search language as found in King.  Furthermore, Pam Malone is not a violent

20  felon, as was King.  See King, 736 F.3d at 810 ("We need not decide whether the Fourth

21  Amendment permits suspicionless searches of probationers who have not accepted a

22  suspicionless-search condition, or of lower level offenders who have accepted a

23  suspicionless-search condition, because those cases are not before us.").  In light of this

24  record, Pam Malone is not subject to suspicionless searches under the limited holding of

25  King, but by accepting probation, she agreed to "a clear and unambiguous search

26  condition" which "significantly diminished [her] reasonable expectation of privacy."  King,

27  736 F.3d at 808 (citing Knights, 534 U.S. at 120).  Under the diminished expectation of

28  privacy for probationers recognized in Knights, Pam Malone's warrantless probation search

United States District Court

For the Northern District of California

condition requires reasonable suspicion to perform a search, but not probable cause. Knights, 534 U.S. at 121 ("[a]lthough the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable").

Based on the weapons found in plain view during the protective sweep, the government has demonstrated that the officers had a sufficiently reasonable suspicion that Pam Malone was engaged in criminal activity to justify the probation search of the detached garage.

As an alternative ground for conducting the probation search, independent of the evidence found in plain view, the information contained in the sealed, ex parte affidavit supports reasonable suspicion, and even probable cause, to believe that Pam Malone was engaged in criminal activity, establishing a legitimate basis for conducting a probation search of her residence in the detached garage.

**b.     Probable Cause to Believe Malone Resided in Garage**

Ninth Circuit authority requires that "before conducting a warrantless search of a residence pursuant to a parolee's parole condition, law enforcement officers must have probable cause to believe that the parolee is a resident of the house to be searched." United States v. Grandberry, 730 F.3d 968, 973 (9th Cir. 2013) (citing United States v. Howard, 447 F.3d 1257, 1262 (9th Cir. 2006), overruled in part on other grounds by United States v. (Marcel) King, 687 F.3d 1189 (9th Cir. 2012) (per curiam)) (internal citations and quotation marks omitted).  The Ninth Circuit applies a relatively stringent standard in determining what constitutes probable cause that a residence belongs to a person on supervised release.  "It is insufficient to show that the parolee may have spent the night there occasionally.  Instead, the facts known to the officers at the time of the search must have been sufficient to support a belief, in 'a man of reasonable caution,' that the parolee lived at the residence." Howard, 447 F.3d at 1262 (citation omitted).  The probable cause

United States District Court

For the Northern District of California

1  standard for a parole search necessarily applies to probation searches as well.  United

2  States v. Franklin, 603 F.3d 652, 656 (9th Cir. 2010).

3         To demonstrate that Officer Deplitch had probable cause to believe that Pam

4  Malone was living in the detached garage, the government argues that he had seen her

5  enter and exit the detached garage several times during his surveillance, and the property

6  owner told him that Malone was renting the garage prior to conducting the search.  Deplitch

7  Decl. ¶¶ 3, 6.  Gomez argues that the officers lacked probable cause to believe that Pam

8  Malone lived at the property because Officer Deplitch saw Malone at the property with

9  "multiple other people," and Deplitch had to rely on an aerial photograph to determine that

10 the detached garage existed.  Gomez points out that Deplitch could not see the detached

11 garage behind the house during surveillance, and questions whether Deplitch could have

12 personally observed Malone enter and exit the garage.  Reply at 15 n.6.  Gomez also

13 argues that the government failed to satisfy three of the indicia of residence set forth in

14 Howard: (1) the officers failed to investigate whether Malone lived at another location,

15 including the address on file with her probation officer; (2) observing Malone 4 times over a

16 2-week period is not "good reason to suspect" that she lived there; (3) the officers did not

17 see Malone with a key.  See Howard, 447 F.3d at 1265-66.

18        Despite the weakness of the first three Howard factors, the fourth Howard factor for

19 indicia of residence, i.e., that either the parolee's co-resident or the parolee himself

20 identified the residence in question as that of the parolee, weighs heavily here.  See

21 Howard, 447 F.3d at 1266.  The landlord's statement that she rented the detached garage

22 to Pam Malone is significant evidence to support probable cause to believe that Malone

23 lived there.  In addition, the officers' own observations of Malone coming and going to the

24 north side of the property in the direction of the detached garage, support probable cause

25 to believe that Pam Malone resided there.  Furthermore, the sealed ex parte affidavit in

26 support of the government's opposition to the motion to suppress provides additional, but

27 not necessary, facts to support probable cause.

28

United States District Court

For the Northern District of California

1    The totality of the circumstances supports the government's assertion that the

2    officers had probable cause to believe Malone resided in the detached garage, and that

3    they had reasonable suspicion to search her residence pursuant to her probation search

4    condition, based on the firearms found in plain view during the protective sweep.

5                    **4.    Landlord's Consent to Search**

6    The government contends that the property owner gave valid consent to

7    search both the main house and the detached garage that was rented out to Pam

8    Malone.  The court has determined that Gomez lacks standing to challenge the

9    search of the main house on the property where the property owner resided, but

10   proceeds to determine the validity of the search of the house, as well as the

11   detached garage.

12   There does not appear to be any dispute whether the property owner could

13   consent to the search of her own house, but Gomez argues that the evidence found

14   as a result of the consent was tainted by the invalid protective sweep and that the

15   landlord's consent was not given voluntarily.  Because the court finds that the

16   protective sweep was valid, it is not necessary to reach the issue whether the

17   landlord's consent was tainted.  The court proceeds to the disputed issues of

18   voluntariness and scope of the landlord's consent.

19                   **a.    Voluntary Consent**

20   Gomez suggests that the property owner did not give voluntary consent

21   because it came on the heals of a dramatic and frightening police raid involving at

22   least 13 officers swarming her property and driving through a fence.  Reply at 17.

23   The court may consider five factors, none of which is individually dispositive, to

24   determine if a consent to search was voluntarily given: (1) whether [the consenting

25   person] was in custody; (2) whether the arresting officers had their guns drawn;

26   (3) whether Miranda warnings were given; (4) whether the [consenting person] was

27   notified that she had a right not to consent; and (5) whether the [consenting person]

28

United States District Court

For the Northern District of California

1   had been told a search warrant could be obtained.  Washington, 490 F.3d at 775

2   (citing United States v. Soriano, 361 F.3d 494, 502 (9th Cir. 2004)).

3        Here, the government has shown that the property owner was not in custody,

4   that the officers did not have their guns drawn when she consented, and that she

5   was never arrested, making Miranda warnings irrelevant.  Opp. at 9.  The property

6   owner signed a Consent to Search form, which states on its face that she was

7   informed that she had a right to refuse consent, and Officer Deplitch states that she

8   was advised of her right to refuse a warrantless search of her premises and her right

9   to refuse to consent to the search.  Deplitch Decl. ¶ 6.  Thus, the government has

10  demonstrated that the property owner's search was voluntary.

11               **b.      Authority to Consent to Search Garage**

12       The landlord gave valid consent with respect to searching the main house,

13  but the landlord did not have actual or apparent authority to consent to the search of

14  the detached garage rented by Pam Malone.  The Ninth Circuit has articulated the

15  following standard for determining whether consent by the property owner justifies a

16  warrantless search of a property:

17           A landlord generally may not give consent to the search of a
         dwelling rented to another.  Chapman v. United States, 365 U.S. 610,
18       616-17 (1961).  Only the occupier or renter can waive the right to
         object to a search.  Stoner v. California, 376 U.S. 483, 489 (1964).
19       However, "when the prosecution seeks to justify a warrantless search
         by proof of voluntary consent, it is not limited to proof that consent was
20       given by the defendant, but may show that permission to search was
         obtained from a third party who possessed common authority over or
21       other sufficient relationship to the premises or effects sought to be
         inspected."  United States v. Matlock, 415 U.S. 164, 171 (1974).  See
22       also [United States v. Dubrofsky, 581 F.2d 208, 212 (9th Cir. 1978).]
         "Common authority" rests on mutual use of the property by those
23       generally having joint access or control so that it is reasonable to
         recognize that any of the parties has the right to permit inspection and
24       others have assumed the risk that the third parties might consent to
         the search.  Matlock, 415 U.S. at 171 n. 7; United States v. Gulma,
25       563 F.2d 386, 389 (9th Cir. 1977).  Even if the consenting third party
         does not in fact possess actual authority to consent, a warrantless
26       search may be justified when the authorities have reasonable grounds
         to believe the consentor has apparent authority to consent.  United
27       States v. Sledge, 650 F.2d 1075, 1077-78 (9th Cir. 1981).

28  United States v. Yarbrough, 852 F.2d 1522, 1533-34 (9th Cir. 1988).

30

United States District Court
For the Northern District of California

1     Here, after conducting the protective sweep of the house and the garage, the

2 officers interviewed the property owner before conducting the search of the house and the

3 garage.  The owner rented the garage to Pam Malone about three weeks before the raid,

4 but Malone had not yet paid any rent.  The owner noticed that Malone had multiple parties

5 at the garage and high pedestrian traffic in and out of the garage since she moved in.

6 Malone and her guests used the bathroom in the house because there was no bathroom in

7 the garage.

8     The facts on this record do not show that the landlord had a sufficient relationship

9 with, or common authority over, the detached garage to give her actual authority to consent

10 to a search, and the police report does not indicate that the landlord used her key to let the

11 officers into the detached garage, as the officers entered through an open door.  Given that

12 the owner told the police that Pam Malone was renting the detached garage from her, the

13 officers could not have reasonably believed that the landlord had apparent authority to

14 consent to a search of Pam Malone's residence.  The government emphasizes that Pam

15 Malone had not yet paid rent, but there is no record that the landlord had initiated eviction

16 proceedings.  The government cites no authority recognizing a "deadbeat renter" exception

17 to the rule that only the occupier or renter can waive the right to object to a search.  Stoner

18 v. California, 376 U.S. 483, 489 (1964).

19     Thus, the landlord's consent does not validate the search of the detached garage,

20 but that search was authorized by Pam Malone's probation search condition, as discussed

21 above.

22         **c.    Consent to Search Curtilage**

23     Gomez argues that the property owner did not consent to search of the curtilage of

24 her home, because she only authorized the search of her residence/vehicle/person located

25 at her address "and any other buildings/structures located on my property."  Opp., Ex. C.

26 Gomez contends that this consent, on its face, does not extend to the curtilage of her

27 home, and that the search of the curtilage exceeded the scope of her consent.  Reply at

28 19.  This argument has no merit.

United States District Court

For the Northern District of California

1    The curtilage concept originated at common law to extend to the area immediately

2    surrounding a dwelling house the same protection under the law of burglary as was

3    afforded the house itself.  United States v. Dunn, 480 U.S. 294, 300 (1987).  The Fourth

4    Amendment protects the curtilage of a house and the extent of curtilage is determined

5    by factors that bear upon whether an individual reasonably may expect that the area in

6    question should be treated as the home itself.  Id.  Because the curtilage is part of the

7    home, searches and seizures in the curtilage without a warrant are also presumptively

8    unreasonable.  United States v. Perea-Rey, 680 F.3d 1179, 1184 (9th Cir. 2012).  Gomez

9    cites Perea-Rey to support his argument that the home and its curtilage are two distinct,

10    protected areas, quoting the well established principle that "[w]arrantless trespasses by the

11    government into the home or its curtilage are Fourth Amendment searches."  Reply at 18-

12    19.  Upon considering the factors to determine whether an area is part of a home's

13    curtilage, the court held that those factors "guide [us] in determining whether the area is so

14    intimately connected to the home that it should fall under the umbrella of the Fourth

15    Amendment's protections."  Id. (citation omitted).  The court's holding in Perea-Rey did not

16    carve out the curtilage as a separate area, but rather protected the curtilage as part of a

17    home.

18    Here, the property owner's consent encompassed her residence and "any other

19    buildings/structures located on my property," and Gomez cites no authority holding that a

20    homeowner's consent to search her property, including her home, would exclude the

21    curtilage outside her home.  In light of the property owner's express consent, there is no

22    basis to exclude evidence seized from the area surrounding her house.

**CONCLUSION**

24    For the foregoing reasons, Gomez's motion to dismiss the indictment (doc. no. 61)

25    and motion to suppress evidence (doc. no. 62) are DENIED.

26    Given that the pendency of this motion was the basis for a Speedy Trial Act

27    exclusion, and that now that it has been decided, the Speedy Trial clock begins again, this

**United States District Court**
For the Northern District of California

1  matter is calendared for trial setting on the court's calendar for March 19, 2014, at 2:30

2  p.m.

3      **IT IS SO ORDERED.**

4  Dated:  March 14, 2014

5                                   PHYLLIS J. HAMILTON
                                 United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28