Ellen V. Leonida, Esq. (SBN: 184194)
leonida@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, 10th Floor
San Francisco, CA 94104
Telephone: (415) 599-0210
Facsimile: (415) 599-0210

Counsel for Defendant,
ANTONIO GOMEZ

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ANTONIO GOMEZ,<br><br>Defendant. | Case No.: 4:13-CR-00282-PJH<br><br>**DEFENDANT'S MOTION TO REVOKE DETENTION ORDER**<br><br>Date:    TBD<br>Time:    TBD<br>Court:   Hon. Phyllis J. Hamilton |

TO:   UNITED STATES OF AMERICA, PLAINTIFF; STEPHANIE HINDS, UNITED STATES
      ATTORNEY; AND CYNTHIA JOHNSON, SPECIAL ASSISTANT UNITED STATES
      ATTORNEY:

PLEASE TAKE NOTICE that as soon as counsel may be heard, Antonio Gomez will move this Court to revoke the detention order issued by Magistrate Judge Donna M. Ryu on February 7, 2022. This motion is based upon this notice of motion and motion, the attached memorandum of points and authorities and exhibits, and upon any further arguments and evidence that may be introduced at the hearing on this motion.

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Mr. Gomez hereby moves to revoke Magistrate Judge Donna M. Ryu's order of detention, issued on February 7, 2022. Probation obtained an under-seal warrant for Mr. Gomez's arrest on October 8, 2021, for alleged violations of the conditions of his supervised release, including the allegation that he was talking to a gang member about "a hit." Mr. Gomez was not informed that the warrant had issued. For the next three months, Mr. Gomez was in constant contact with his probation officer, living at the address he provided to probation. The government made no effort to arrest him during this time. After his arrest on January 19, 2022—which occurred when Mr. Gomez voluntarily went to the probation office—however, the government and probation sought detention on the grounds that he posed a risk of flight and a danger to the community.

Magistrate Judge Ryu conducted a detention hearing (and preliminary hearing) on January 24, 2022, and February 7, 2022. At the hearing, the government's witness testified that Mr. Gomez was not, in fact, involved in any conversations about a gang hit. Mr. Gomez presented evidence of his exemplary record on supervision, his unrequited efforts to reach his probation officer in the preceding months, and the fact that he was supposed to start a new job on January 24, 2022. Moreover, while the detention hearing was pending, Mr. Gomez was brutally attacked at the Santa Rita jail, requiring more than thirty stiches in his eye, as well as orbital surgery.[1] Nonetheless, Magistrate Ryu ordered Mr. Gomez detained on February 7, 2022, finding that he would pose a danger to the community if released. (Dkt. No 161.) This finding was unsupported by the evidence in the record.

## FACTS

Antonio Gomez has been on supervised release since January 8, 2021. During that time, he has maintained constant contact with his probation officer, although she rarely reciprocated. (*See* Dkt. No. 164, Exhibits A, D.) Mr. Gomez has been living with his wife and has been taking

---

[1] Although Santa Rita deputies refused to allow Mr. Gomez to undergo the orbital surgery recommended by the emergency room doctors, jail staff eventually acquiesced to the medical professionals and Mr. Gomez's orbital surgery has finally been approved.

advantage of New Life Recovery Home Ministry to re-integrate into society and pursue educational and vocational opportunities. (Dkt. No 164, Ex C.) Mr. Gomez even secured gainful employment as a truck driver—a job he was scheduled to start on January 24, 2022. (Dkt. No 164, Ex. B.)

On October 6, 2021, Mr. Gomez's probation officer, Lisa Hage, submitted a Petition for Warrant for Person Under Supervision ("Form 12"), alleging that Mr. Gomez had violated the terms of his supervision by leaving the judicial district without approval on September 14, 2021, and by communicating with gang member Juan Gallegos, who was incarcerated in the Bureau of Prisons ("BOP"). (Dkt. No 150.) Regarding the September 14 incident, the Form 12 alleged that Mr. Gomez was contacted by a Nevada police officer in a rental vehicle. (*Id.* at 2.) The Form 12 does not include any information regarding why Mr. Gomez went to Nevada on September 14, or whether he sought permission to do so. The Form 12 also alleged that Mr. Gomez was communicating with Mr. Gallegos about gang politics and taxes, and that "Gomez also told Gallegos that a prison inmate housed in the California Department of Corrections was 'on deck' to do a hit in 30 days." (*Id.*) Based on these representations, the Court issued a warrant for Mr. Gomez's arrest on October 8, 2021. (*Id.* at 3.)

Over the next four months, Mr. Gomez repeatedly reached out to his probation officer:



1   (Dkt. No 164, Ex. D.) Eventually, probation responded to one of Mr. Gomez's text messages and

2   asked him to report to the probation office for a "yearly review." (*Id.*) When Mr. Gomez arrived for

3   his appointment, he was arrested. At no time during the preceding three months did the government

4   make any effort to arrest Mr. Gomez, either by going to his home or by asking him to come to the

5   probation office. After Mr. Gomez's arrest, however, both the probation officer and the government

6   claimed that he posed a danger and a flight risk and should be detained.

7          In arguing for Mr. Gomez's detention, the probation officer affirmatively misrepresented to

8   the Court her communications with Mr. Gomez about leaving the District on September 14, 2021.

9   The probation officer told the Court that, "he never contacted me about going to Nevada."

10  (Declaration of Ellen Leonida ("Leonida Decl."), Ex. E, January 24, 2022 Hearing Tr. at 10:17-18.)

11  This statement was belied by a series of increasingly frantic text messages on September 13 and 14,

12  2021, in which Mr. Gomez repeatedly begged his probation officer for permission to drive to

13  Nevada, where his son and infant granddaughter were stranded in the cold:



25  (Dkt. No 164, Ex. A.) Not only did Mr. Gomez attempt to get his probation officer's permission

26  before deciding that this emergency required him to travel out of District, but he also informed her

27  that he had been pulled over. (*Id.*) As usual, she did not respond to him.

28

At Mr. Gomez's Identification of Counsel hearing, Magistrate Judge Ryu set a detention/preliminary hearing for January 28 and instructed the government to present a witness at that hearing who had knowledge of the alleged calls made by Mr. Gomez, specifically, the BOP investigator who informed probation of these calls. (Leonida Decl., Ex. E at 27:16-21 ("And what I would want is the people from the Bureau of Prisons who can talk about the basis for the charge. So what was the investigation, how did they tie this back to Mr. Gomez?")).

The government chose to ignore Judge Ryu's instruction and failed to present the BOP investigator as directed. Instead, the government opted to call Mr. Gomez's probation officer—who had no knowledge of the BOP investigation—as a witness.[2] The probation officer did claim to be able to recognize Mr. Gomez's voice in the two charged phone calls—but her limited contact with Mr. Gomez called into question her ability to do so. The probation officer originally testified, for example, that she had spoken to Mr. Gomez in person on ten to fifteen occasions and was familiar with his voice; on cross examination, however, she admitted that she had only met with him ***three*** times. Nor could the probation officer provide any information about why the BOP thought that the person talking to Mr. Gallegos in their recordings was Mr. Gomez. Despite this, the Court gave the government another chance to present evidence and kept Mr. Gomez detained pending their production of the witness they had already been ordered to produce on January 24.

While Mr. Gomez was in custody waiting for his continued detention hearing to take place, he was brutally attacked and rushed to the hospital. Doctors there recommended emergency orbital surgery, but the jail deputies denied Mr. Gomez surgery after deciding that this surgical recommendation was insufficiently documented by hospital staff. He was returned to Santa Rita jail without the emergency surgery. As of today's date, Santa Rita and the U.S. Marshals have finally approved Mr. Gomez's surgery. But as he sits in custody waiting for that surgery to happen, he can feel the excruciating sensation of his broken facial bones grinding into each other with every breath he takes.

---

[2] Undersigned counsel is currently in the process of transcribing the audio recording of the initial detention hearing (which took place on January 28, 2022, *see* Dkt. No. 157), and will file the transcript with the Court as soon as it is complete.

During the second phase of the detention hearing (which Mr. Gomez attended via a tablet at the Santa Rita Jail infirmary), additional allegations in the Form 12 were called into question. Nicholas Barrientos, a gang intelligence analyst at BOP, testified regarding Mr. Gomez's alleged communications with Mr. Gallegos. Mr. Barrientos testified unequivocally that Mr. Gomez had not participated in any conversations about "a hit" and nobody had ever claimed that he was involved in a conversation about a hit.  (Leonida Decl., Ex. F, February 7, 2022 Hearing Tr. at 45.) The probation officer's allegation in the Form 12 that "Gomez also told Gallegos that a prison inmate housed in the California Department of Corrections was 'on deck' to do a hit in 30 days," as it turns out, was simply untrue.

## ARGUMENT

A person held in custody for allegedly violating conditions of supervised release may be released from detention upon demonstrating by clear and convincing evidence that he will not pose a danger to another person or the community. Fed. R. Crim. P. 32.1(a)(6); 18 U.S.C. § 3143(a)(1). Pursuant to the Bail Reform Act, the district court reviews a magistrate judge's detention order *de novo*. *United States v. Koenig*, 912 F.2d 1190, 1191 (9th Cir. 1990). As such, when a defendant moves to revoke the magistrate's detention order, the court must "review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference." *Id.* at 1193.

## I. MR. GOMEZ'S RECENT PROGRESS ON SUPERVISION SHOWS THAT HE IS NOT A DANGER

Mr. Gomez's behavior on supervision demonstrates that he does not pose a danger to the community. Since his release from prison, he has been residing at a stable address with his wife. He has participated in rehabilitation services offered through New Life Recovery Home Ministry, where his mentor reported that he was making excellent progress in reuniting with his children, getting an education, and "striving to change the course of his life and the decisions he makes daily." (Dkt. No 164, Ex. C). He even secured employment, although he lost that job when he was incarcerated on these allegations. (Dkt. No 164, Ex. B.)

Any purported dangerousness is also mitigated by Mr. Gomez's recent and severe eye injury, for which he will undergo surgery in the very near future. *See United States v. Garcia*, 340 F.3d 1013, 1021 (9th Cir. 2003) ("A wholly incapacitated defendant, for example, might be entirely unable either to act violently or to abscond. Notably, as we have suggested, the absence of any possible future dangerousness or flight is most likely to be present in cases in which other mitigating factors, such as a sufficiently serious illness or injury, also exist."). Mr. Gomez's severe injury, his impending surgery (which will hopefully commence as soon as possible), and his necessary post-operation rehabilitation all significantly decrease any theoretical possibility that he would pose a danger to society upon release.

Moreover, the government's nonchalance about arresting Mr. Gomez between October 8, 2021, and January 19, 2022—when he voluntarily came to the probation office—belies any claim of dangerousness. Mr. Gomez spent that time reporting to his probation officer (as she continued to ignore him) while residing at his reported address. If the government were aware of any real danger posed by Mr. Gomez to the community, it would not have waited over three months to arrest him.

## II.     THE ALLEGATION THAT MR. GOMEZ WAS INVOLVED IN "A HIT" WAS CATEGORICALLY DISPROVEN

The only allegation of actual dangerousness—that Mr. Gomez was talking about a murder—was conclusively disproven. The Form 12 alleges that Mr. Gomez "told Gallegos that a prison inmate housed in the California Department of Corrections was 'on deck' to do a hit in 30 days." (Dkt. No 150 at 2.) The hearings conducted in front of Magistrate Ryu conclusively established that this was not true and did not happen.[3] The only remaining allegations are that Mr. Gomez talked to a gang member about gang politics and taxes. Being a member of a gang—without evidence of any actual *danger* to the community—does not justify detention. Here, Mr. Gomez met his burden to show that he poses no danger to another person or the community. The government presented no evidence to the contrary.

---

[3] Mr. Gomez maintains that he was not the person who made the calls described in the Form 12 about gang politics and taxes, but resolution of the identity issue is not dispositive of this motion.

**<u>CONCLUSION</u>**

Judge Ryu's finding that Mr. Gomez would pose a danger to the community if released is incorrect and unsupported by the record. The question of dangerousness is different from the question of whether the government met their burden at a preliminary hearing. Here, Mr. Gomez presented clear and convincing evidence that he was in touch with his probation officer, that he was engaged in a program of education and rehabilitation, and that he was about to start a new job. His severe eye injury further mitigates any danger. And the government's witness unequivocally testified that Mr. Gomez was innocent of the "hit" allegation in the Form 12. For these reasons, Mr. Gomez respectfully requests that the Court revoke the magistrate's detention order and release him.

Dated: February 11, 2022             Respectfully Submitted,

BRAUNHAGEY & BORDEN LLP


By: *s/ Ellen V. Leonida*
Ellen V. Leonida